[Civil No. 3237. Filed January 30, 1933.]

[18 Pac. (2d) 649.]

GEORGE I. TAYLOR, C. KATE MANSFIELD and GEORGE A. SHEA, Appellants, v. KINGMAN FELDSPAR COMPANY, a Corporation, Appellee.

Mr. James E. Martin and Mr. E. Elmo Bollinger, for Appellants.

Messrs. Smith & Faulkner, for Appellee.

LOCKWOOD, J.—George I. Taylor, C. Kate Mansfield and George A. Shea, hereinafter called plaintiffs, brought an action against Kingman Feldspar Company, a corporation, hereinafter called defendant, to quiet title and to cancel a lease on certain mining claims in Mohave county, Arizona. Defendant answered and cross-complained setting up the lease above referred to as the sole basis of its claim to possession of the premises, and praying that it be permitted to continue in possession thereunder, and that it be adjudged plaintiffs' interest in the premises was subject to the lease. The case was tried to the court without a jury, and, judgment being rendered in favor of defendant, this appeal has been taken.

There are some seven assignments of error, each containing many subdivisions, but counsel for appellants have very properly and commendably stated the

three legal propositions raised thereby in accordance with the rules of this court and have thus simplified our labors greatly and assisted us to render a clearer and more succinct opinion. We approve most highly of their action, and only wish that the rule was observed in as creditable a manner in other cases as in this. These propositions are as follows, and we consider them in their order:

"1. Where a mining lease does not provide any time within which the lessee must begin mining and the sole consideration accruing to the lessor thereunder is the promise of the lessee to pay to lessor a royalty only on such ore as may be mined and shipped from the demised premises, and gives to lessee the sole and absolute right without payment of consideration to lessor for the exercise of such right, to terminate and cancel the lease for any cause or without cause, in the sole discretion of lessee, such lease is voidable for want of mutuality.

"2. In the absence of any express covenant upon the subject there is an implied covenant that the lessee in a mining lease, where the sole consideration accruing to the lessor is the promise of the lessee to pay to lessor a royalty only on such ore as may be mined and shipped from the demised premises, will prosecute the work of mining and shipping with reasonable diligence and continuity of effort, and the failure or refusal of the lessee to so prosecute such work constitutes a breach of contract and a failure of consideration which entitled the lessor to have such lease cancelled and to be restored to possession.

"3. In a mining lease wherein the lessee agrees to pay lessor a royalty on all ore mined and shipped in the following language, to-wit: 'To pay to the parties of the first part a royalty on all ore extracted and shipped from said mining claims and premises, of one dollar per ton on all feldspar shipped and seventy-five cents per ton on all silica shipped from said premises. Payments on account of royalty shall be made on or before the 10th day of each month for all ores shipped and upon which returns have been received during the preceding month.'

"The word 'returns' as so used, in the absence of any evidence showing a different intention on the part of the lessor and lessee, must be taken to mean return of railroad scale weights."

A brief statement of certain facts is necessary. In 1924, Taylor and Mansfield, who were then the owners of the claims involved in this action, leased the claims to the predecessors in interest of defendant herein upon certain terms, the material ones of which read as follows:

"3. In consideration of this lease the parties of the second part, agree to pay as rental for said premises, as follows:

"a. The sum of Fifteen Hundred Dollars upon the execution hereof.

"b. The further sum of Three Hundred Dollars, on or before the first day of April, 1924.

"c. The further sum of Two Thousand Dollars, on or before sixty days from the date hereof.

"d. To pay to the parties of the first part a royalty on all ore extracted and shipped from said mining claims and premises, of one dollar per ton on all feldspar shipped and seventy-five cents per ton on all silica shipped from said premises. Payments on account of royalty shall be made on or before the 10th day of each month for all ores shipped and upon which returns have been received during the preceding month.

"4. It is distinctly understood, however, that the payments of Fifteen Hundred Dollars, Three Hundred Dollars, and Two Thousand Dollars, above mentioned, shall not be in addition to the royalty payments mentioned, but shall be and shall be considered as advances upon such royalty, and same shall be repaid to the parties of the second part in the following manner, to-wit:

"That the parties of the second part shall deduct and withhold from said royalty payments fifty per centum (50%) on all royalties due the parties of the first part upon monthly shipments of five hundred tons or less, and by deducting and withholding sixty per centum (60%) of royalties upon any monthly

shipments between five hundred tons and one thousand tons, and by deducting and withholding seventy-five per centum of any royalties on monthly shipments of any number of tons exceeding one thousand tons, such deduction to continue until said advances have been fully repaid to the parties of the second part. . . .

"8. The terms of this lease *is* ninety-nine (99) years from the date hereof, Provided, However, that said parties of the second part may terminate this lease and all rights hereunder upon giving written notice to the parties of the first part, at said Arizona Central Bank, of their intention so to do, and upon their executing and delivering to said Bank for the parties of the first part, within thirty days thereafterwards, a complete relinquishment and release hereof, in *wiring;* and in such case said parties of the second part have the right to remove any improvements placed by them upon said premises within sixty days after the execution of such relinquishment.

"9. The parties of the first part shall prove and file all necessary records establishing the *permorance* on the annual assessment work on said premises for the year 1923, and the assessment work thereon hereafter during the life of this lease shall be done and performed by the parties of the second part at their own cost and expense."

In pursuance thereof the original lessees and their assigns paid the $3,800 as above required, and thereafter mined and sold large quantities of feldspar during the years 1924 to 1930, inclusive, the amounts being approximately 818 tons in 1924, 1,676 tons in 1925, 2,108 tons in 1926, 2,569 tons in 1927, and 1,839 tons in 1928, all being shipped before the present owners of the lease took possession of the premises. This possession was taken in February, 1929, and from that date until the beginning of this suit, a period of some eighteen months, only 859 tons were shipped. The royalties for the feldspar so shipped were promptly and properly paid to the owners of

the claims, with the exception that between November, 1928, and July, 1929, a certain quantity of feldspar, the royalties on which would have amounted to about $450, was shipped by defendant to Flynt Silica & Spar Company, of Los Angeles, California, for which defendant has never been paid, and on which it had paid no royalties to plaintiffs. These facts are not contradicted. There are certain other matters of fact which are in dispute and which we will refer to in discussing the second proposition of law above set forth.

The lease in question did not expressly make any provision as to when the lessee should begin mining, as to how much work it should do, except the assessment work as aforesaid, or how much feldspar it should or would extract, nor did it expressly give the lessors the right to terminate the lease at any time or for any reason.

It is urged that a lease of this nature is void for want of mutuality. Mutuality is well defined as follows:

"Mutuality of contract consists in the obligation on each party to do, or to permit something to be done, in consideration of the act or promise of the other. Contracts lacking in mutuality are often termed unilateral contracts. Mutuality of obligation is an essential element of every enforceable agreement. Mutuality is absent when one only of the contracting parties is bound to perform, and the rights of the parties exist at the option of one only. And, conversely, a contract is not unilateral where it contains mutual obligations binding on both parties. Mutuality does not require that both engagements must be expressed in the same form, for one may be in writing and the other by parol. The benefits or liabilities of the parties need not be equal. It is sufficient that a consideration moved to both parties, and *mutual promises are not essential where a sufficient consideration is otherwise present*. Where there are mutual promises between the parties, it is not neces-

sary to render a particular promise by one party binding that there be a special promise on the part of the other party directed to that particular obligation." 13 C. J. 331. (Italics ours.)

It appears therefrom that mutual promises are not necessary if there be a sufficient consideration, and it is urged by defendant that the payment of the $3,800 is a sufficient consideration for the lease, notwithstanding that it may be terminated at the option of the lessee at any time and for any reason, although such right is not given to the lessor. Plaintiffs in reply to this say that while it is true a substantial sum was paid them in advance, yet since it was by the terms of the lease to be deducted from the royalties accruing thereafter, and since there was no specific provision as to the amount of work to be done or feldspar extracted by defendant, it was in effect nothing but a promise to pay royalty on whatever amount of feldspar defendant decided to mine, and insufficient as a consideration for the lease. In support of this position plaintiffs cite to us the cases of *Kentucky Coke Co.* v. *Smith,* 207 Ky. 485, 269 S. W. 558; *Killebrew et al.* v. *Murray,* 151 Ky. 345, 151 S. W. 662; *Tennessee Oil, Gas & Mineral Co.* v. *Brown,* (C. C. A.) 131 Fed. 696; *Great Northern Ry. Co.* v. *Sheyenne Telephone Co.,* 27 N. D. 256, 145 N. W. 1062; *American Agricultural Chemical Co.* v. *Kennedy & Crawford,* 103 Va. 171, 48 S. E. 868. We have examined and analyzed these cases, and are of the opinion that while the rule of law stated by plaintiffs as their proposition one is correct and upheld by the cases cited, the facts of the present case do not bring it within that rule. In each of those cases it appears that there was either no consideration paid for the making of the agreement therein involved, or else it was merely a nominal one. Further, in many of them the lessee made no effort whatever to begin

work within a reasonable time after the execution of the lease, or else had long abandoned the work after beginning. For example, in the first case above cited, on which plaintiffs lay great stress, the lessee had done no work at all on the premises for more than twenty years before the action to cancel the lease was brought. In the instant case the consideration paid practically at the inception of the lease amounted to some $3,800. It is true that this amount was finally credited on the royalties which afterwards became due plaintiffs, but had defendant failed entirely to extract any feldspar from the premises, so that no royalties would have been due, plaintiffs would nevertheless have been entitled to retain the $3,800. We are of the opinion that the payment of this sum, which was to be retained by plaintiffs under any condition, was a sufficient consideration to refute the claim of want of mutuality.

We consider then the second proposition above stated. Again we think plaintiffs have correctly stated the general rule of law. While it is true that a large number, if not the majority of the cases upholding this principle have arisen where the lease was for oil or gas lands, we are nevertheless impressed that the same rule in reason should apply to mineral land of any character. When mining claims are leased on a royalty basis, the only way in which the lessor can get anything for his property is through the lessees working it. It is obvious that no sane man would execute such a lease unless he believed the lessee would at least make a reasonable effort to develop the premises, and we think that a lease which provides the sole or the main consideration moving to the lessor is to be a royalty from the proceeds of the mine implies a covenant for diligent operation and imposes on the lessee the duty of proceeding in that manner, and his failure or refusal so

to do .constitutes a breach of contract which warrants the lessor in cancelling the lease. *Sledge* v. *Stolz,* 41 Cal. App. 209, 182 Pac. 340; *McIntosh* v. *Robb,* 4 Cal. App. 484, 88 Pac. 517; *Downing* v. *Rademacher et al.,* 133 Cal. 220, 65 Pac. 385, 85 Am. St. Rep. 160; *Pritchard* v. *McLeod et al.,* (C. C. A.) 205 Fed. 24; *Sharp* v. *Behr,* (C. C.) 117 Fed. 864; 60 A. L. R. 901, and note.

Let us then examine the evidence to see whether defendant did proceed with reasonable diligence and effort to extract feldspar from the claims in question. It appears from the undisputed evidence that during the first five years of the lease an average of about 150 tons of feldspar per month were taken from the claims and sold and the proper royalties paid thereon. During the eighteen months in which the defendant operated the claims that average dropped to less than 50 tons per month, or a decrease of three-fourths. In the absence of some reasonable excuse for this change, it would appear that such conduct by defendant violated the rule of law above stated, and that plaintiffs would be entitled to cancel the lease therefor. We must therefore consider whether the record showed such an excuse, and in so doing the evidence must, of course, be taken in its strongest manner as supporting the judgment of the trial court. *Brown* v. *Brown,* 38 Ariz. 459, 300 Pac. 1007; *Spillsbury* v. *School Dist. No. 19,* 37 Ariz. 43, 288 Pac. 1027. From this evidence it appears that, due to the freight rates, practically the only place where the feldspar from these claims could be sold was in Southern California, and as a matter of fact that is where it was all sold. Feldspar of this character is used almost entirely in the manufacture of tiling, bathtubs, enamelware and ceramic products in general. Before it can be used it must be ground into a fine powder, and neither defendant nor its predecessors in interest at any time before this suit was brought were the owners

of a mill of the kind necessary to do this situated near enough to the mining claims to be of any use. It was therefore necessary that they sell the crude feldspar to purchasers who owned mills of their own or could make arrangements for having it ground. The largest customer for this particular class of feldspar was the Flynt Silica & Spar Company, of Los Angeles, above referred to, which operated a grinding mill leased by it from another corporation. During 1929 or 1930, this company failed, leaving, as we have stated above, a considerable indebtedness to defendant for feldspar already purchased, and was, of course, no longer in the market. It also appears that there was in Southern California a large feldspar deposit near Campo which had thereon a grinding mill of large capacity, and which came into production shortly before defendant took over the lease. It is reasonable to suppose that this feldspar was in close competition with that produced from the Kingman claims, for the year 1928 shows a drop of nearly 30 per cent. in the amount of feldspar shipped from the claims over that of 1927, when apparently the Campo feldspar was available only in its crude form. But the principal reason urged by defendant for the tremendous drop in the amount of feldspar shipped is the general business depression which commenced in the year 1929, and has continued ever since. This depression is so notorious and widespread that even this court cannot help taking judicial notice thereof, though its extent varies in different localities. As to how this affected the feldspar market we have the statement of plaintiffs' chief expert witness, Dr. Malinovszki, who testified that the Washington Iron Works, of which he was chief chemist, was using less than 25 per cent. of the amount of feldspar at the time of the trial which it was using in the palmy days of 1927 and 1928.

It also appears from the testimony of defendant's witnesses that they made every reasonable effort to sell all the feldspar they could, but were unable to secure orders for any more than that actually sold. We think that while the rule above stated requires that the lessee of a mining claim who has agreed to pay royalties on the gross product should use every reasonable effort to produce and sell as much ore as is possible, when there is a temporary depression in the value of the ore produced, such lessee is not required to extract ore at a loss merely so that the lessor may have royalties thereon. *O. K. Jellico Coal Co.* v. *Parks et al.,* 146 Ky. 674, 143 S. W. 22; *Colorado Fuel & Iron Co.* v. *Pryor,* 25 Colo. 540, 57 Pac. 51. What the rule might be, where it was evident that the lessee could never mine at a profit, need not be considered. There is sufficient evidence from which the trial court could have found, as we must assume it did, that defendant, under the circumstances existing during the period during which a default is claimed, did use due diligence in its operations. Should it appear at a later time, or under different circumstances, that it was not so proceeding, the judgment in this case would, of course, be no bar to a subsequent action to cancel the lease.

We come then to the third proposition, which is that the word "returns" in the provision of the lease above set forth means railroad scale returns rather than receipt by defendant of the money for the feldspar it has sold. It is so unusual to require the payment of royalties on a product before the party who is to pay them has received payment for the product that we think it would require explicit and affirmative language to convince us that it was intended that such should be done. It may be perhaps admitted that the clause in question is ambiguous, and in such case if it had been customary for the lessee to make the pay-

ments of the royalties before it received the money therefor itself, evidence of that fact would have been admissible as showing the interpretation placed on the contract by the parties. Our attention has not been called, however, to any evidence that the parties had placed the construction contended for by plaintiffs on the clause in question, and, such being the case, we are of the opinion the reasonable interpretation is that the payments were to be made when defendant received the money for the shipments, and not before.

This disposes of the assignments of error advanced by plaintiffs in support of their appeal. For the reasons foregoing, the judgment of the superior court of Mohave county is affirmed.

ROSS, C. J., and McALISTER, J., concur.